Next case is 06-5059 Navajo Nation v. U.S. Mr. Frye, will you be able to verify for us where you are? Yes, Your Honor. May it please the Court? Are you ready? I am, sir. I'm Paul Frye representing Navajo Nation. We are here to address the question that the Supreme Court left open in the Navajo Nation case whether a network of statutes, regulations, treaties, and other fundamental documents confer sufficient federal control or supervision over Navajo coal as to impose trust duties for the management of that coal and whether any of those authorities individually might impose trust duties as well. I was going to say, for my benefit, I don't know how my colleagues feel about it. I wish you would take those up in reverse order because it seems to me the second is the more difficult question. Let me just make disclosure, I think you have the network case pretty well and the trial judge so helped. What I'm having more trouble with is your second point, finding what Justice Ginsburg and the majority seem to want which is a specific statute or regulation that pinpoints the error that was made by the government. Yes, and the answer has two parts. One goes to the premise of the question, Judge Clay here, and that is, is there a requirement when you have this comprehensive federal control or supervision of trust resource, is there a requirement that each and every duty be spelled out specifically in a statute of regulation? The answer to that is no, and the White Mountain case shows that. Both this court's decision in White Mountain and the Supreme Court's decision in White Mountain where both courts said that there were no specific duties set forth in the 1960 Act. But Justice Ginsburg really made a point of trying to distinguish Navajo from White Mountain, didn't she? She did indeed. She did indeed. She once put a half a dozen times in her opinion. She kept banging away on that one point. And I think the reason is, Your Honor, is that what the court was dealing with in that case was a single statute that provided only a bare trust. It wasn't looking at a whole network of statutes that deal with all aspects of Navajo code. So next I will go straight to the next question. Are you telling us we should underrule the Supreme Court's Navajo decision and do something different than the court seems to want us to do? No, I think that the court should adopt the Supreme Court's jurisprudence in the Mitchell 2 case and the White Mountain case where there was something more than a bare trust in those cases. So in Mitchell 2 there wasn't there a requirement for the management, forest management? There was indeed, and it was a sustained yield requirement written into two separate statutes. Written right into the statute? That's right. And it turns out that the Navajo Rehabilitation Act, on which we rely heavily, does have a sustained yield requirement for renewable resources. But of course coal is not a renewable resource. So the analogous provision to the sustained yield requirement in Mitchell 2 is this whole panoply of BLM, Office of Surface Mining, and Bureau of Indian Affairs regulation over surface mining so that no coal is left behind and you don't have re-mining and the land is restored to its previous productive capacity. But how does that impose a requirement on the United States as a trustee to carry forward on the mining moves? It doesn't specifically. That goes back to Judge Blader's question. What are the specific duties coming out of specific statutory provisions? And I would look at the fair inferences from the Rehabilitation Act itself, Section 635, Title 25. See, fair inferences goes to the question, if I understand it, and I admit the law here is kind of difficult and I may be all wrong, but I think fair inferences goes to the question of whether the statute is money-mandating. I'm prepared to concede you that there's lots of money-mandating statutes floating around. My problem, frankly, is trying to find the guides or standards circumscribing the Secretary's affirmation of coal mining leases. No textual basis, says Justice Ginsburg and a majority of the Supremes. You've got to help us. The textual basis is found in Section 635, I think. And I do believe fair inference goes to liability as well as money-mandating nature of the statute. Section 635 says that the Navajo Nation can lease, with the Secretary's approval, its trust mines. That's sort of the end of 635A. 635B deals with tribal fee lands. And it says in 635B, contrary to 635A, that we operate under, that the Navajo Nation's conveyance or disposal of its fee lands shall not create any liability or obligation on the part of the Secretary. 635C says the Navajo Nation can convey its trust lands to municipal or tribal corporations. And in that subsection as well, the Congress provided that subsequent to that conveyance, the United States shall have no responsibility or liability for the management of those resources. Now, the flipping of the coin, Section 636 in the Rehabilitation Act authorizes the Navajo Nation to adopt a constitution. And Congress said in that section that the Navajo Nation should have maximum flexibility so that it can take on as many responsibilities as it wants to and have full responsibilities and opportunities as full citizens of the United States. So the Navajo Nation did that. It drafted a constitution. It provided it to the Secretary of the Interior and said, please approve this. And the Secretary said, oh, no. No, you want to lease your own minerals. That's my job. And the Secretary of the Interior then rejected the Navajo constitution on that basis. And there's a published- How does that help? Where are you going with all of that? I'm going actually to whether the Secretary has sufficient control and oversight of Navajo coal leasing to apply a compensable trust to this. I think that's pretty much a given, isn't it? He does have- You're preaching to the choir on that one. I mean, it's a kind of a situation where every action which is taken with respect to natural resources on Native American reservations  However, Navajo Supreme Court really didn't do much for that particular requirement. They said unless there's a specific duty and responsibility by the Secretary almost in management of those natural resources, then there's no trust responsibility. That's what we have to overcome. I respectfully disagree with that analysis because in the Mitchell case, which is- in this court's Mitchell case- Yeah, Mitchell suit. Yeah, 664 F. Second. This court held that even though there was no requirement in any statute or regulation that the Secretary of the Interior build roads to facilitate- build and maintain roads to facilitate the timber production, that was a duty that was reasonably deferred and it was a compensable one. in the federal treasury on behalf of the Indians. Government said we got 4%. This court said that's not enough. As trustee, you have to strive for the ceiling and not settle for the floor. And the Supreme Court affirmed that decision. Similarly in White Mountain, there was no specific statutory requirement anywhere that required a duty of care. But the duty of care was deferred and it was a compensable duty of care in that case. Assuming we find a duty of loyalty and a duty of care, what's the scope of the duty of care? What are the damages that would be required to be assessed? The damages- for example, duty of loyalty. I'll talk about that first. In the first opinion of the Court of Federal Claims, Judge Baskier on page 235 said, yes, there's self-dealing here. The Bureau of Reclamation benefited from this lower coal prices because it's a 24.3% over one of the power plants using it. That's $84 million worth of benefit to the federal government for the underselling of the Navajo Nation's coal. And that's- in terms of the sites to the record, I would look at the appendix, pages 736, 1860, and paragraph 349 of the proposed findings of fact on page 2064. So the federal government preferred its own interest to ours to the tune of $84 million. In terms of the damages for the breach of the duty of care, I still haven't answered Judge Flager's question because there are specific statutes that we rely on. We rely on section 638. You like the rehabilitation. We do, and we also rely on section 1300E. Before you move on, 638 is good. I've got that right here. Yes. And it talks about how the Secretary of Interior shall consider the recommendations of tribal council and follow such recommendation whenever he deems them feasible and consistent with the objectives of this sub-chapter. The objectives, I understand, are to help the nation realize the most for its coal or other natural resources. Is that right? That's absolutely correct. And so your recommendation to him, if I'm remembering right, was an expedient resolution of the appeal so that you would have a determination regarding an appropriate royalty rate, which you could then use in the course of your negotiations or settlements and to extend that to other leases, and that my understanding is your argument is he did you an incredible, your client, an incredible disservice, to say the least, if not committed corruption or fraud in the process, but a general disservice and certainly did not act whenever feasible, consistent with the objectives to expediently give you that appellate decision. Is that right? That's precisely correct. And all of... Was it feasible? Yes. All of the studies... Well, the thing was already written, right? It was written. It was sitting there. It just never got signed. It needed a signature from someone who was off of reserve duty and had already gone through the decision line by line. And then subsequently resigned as a result of all this, I understand. Well, two people resigned as a result of this. And the other statute that we rely on is Section 1300D of the Service Funding Control and Reclamation Act, which is a specific Indian land section that requires the secretary to insert terms and conditions into leases that are desired by the Indian tribes in addition to the environmental provisions that Sections C and D... And the secretary can come up with his own conditions under those statutes, too. Well, the secretary was actually... In addition to the statutes... In addition to the conditions that were suggested by the tribe. I'm not so sure that the secretary could do... I mean, the secretary has the authority to do that. As long as they're consistent with the objective of helping the nation realize the most. There also is a Supreme Court case that goes to that point. And then the Division of Indian Rehabilitation Act, which has the same language as the Mining Service Act. We'll restore your... Mr. Hayward? Yes. Good afternoon, Your Honor. May it please the Court. I'd like to very briefly address the waiver issue before going on to the merits. I think the waiver issue can be summarized as follows. The tribe could have raised its net worth without animal argument in its first appeal. Under this Court's precedent, if you don't raise an argument in the first appeal from the judgment, you waive the argument. Since the tribe didn't raise its argument in its first appeal, it's waived the issue for a second appeal. We seem to have delegated, strangely enough, that decision to the trial judge, and the trial judge held against you. That's right. Although not on the facts, just on the law. I suppose we should give full deference to the trial judge since we delegated the issue to him. Well, with all due respect, I think that, as I was just saying, on the factual issues, yes. As to the legal import of the facts, no. You shouldn't spend too much time on that. I think that's a dead duck. But go ahead. Okay. Well, as I said, I've summarized the issue. I think this Court's precedent is clear. You have to raise it on the first appeal from the judgment. The Court of Federal Claims here said that it wasn't waived because you can't waive a jurisdictional issue. But as we pointed out, that's misconstruing what a jurisdictional issue is. Now, moving on to the merits. The tribe's network of statutes and regulations cannot support the CFC's jurisdiction. The record is absolutely clear that the Secretary here was acting pursuant to him. That's what the Navajo tribe asserted in its claim. If you look at Joint Dependents, page 1995, that's what the contemporaneous documents of the Secretary noted. If you look at Joint Dependents, page 868, the Secretary here was acting pursuant to him. Now, that's, of course, exactly what the Supreme Court addressed, was what duties did him impose on the Secretary in implementing the act? And the Court looked at the statute and said... And they've already disposed of all of that. We're back here now on a whole other set of... But this is precisely my point, is that there are two things that come out of the Supreme Court's decision. The first is that the Court looked at Imla and said there are no duties here. The second thing is that the Court also looked at Imla and said it is incompatible with Imla to have duties because the point of Imla is to give the tribe, not the Secretary, control over Imla Coliseum. Now, that... Are you arguing against the network theory why there is a fiduciary obligation on the government, or are you moving to point two, which is even assuming there's a fiduciary obligation on the government as a general proposition, a proposition which is often hard to deny, point two is, well, you can't find a specific duty that has been breached. Which one are you addressing? Well, actually, I think the Supreme Court compressed both of those questions into one and just said, looking at the specific conduct at issue here, you know, the Supreme Court cast... Well, the Supreme Court dealt with three specific statutes. But my point... And they then remanded. Why did the Supreme Court not just reverse and end the case there? What was the point of the remand? I'm not asking that rhetorically. I don't understand. What was the remand about? Well, the Supreme Court routinely leaves an open-ended... to decide whether the case is over or whether there's something more to be done because the lower court's in the best position to make that judgment. So you then remanded it to the trial judge because apparently we didn't think it was over either. Well, you remanded it to decide whether it was over. And the trial judge has decided that there's a network, there's a fiduciary duty. Isn't that what the trial judge... No, I think the trial judge, just like the Supreme Court, looked at it in one piece and said, you have to find not just a network in some ethereal sense, in some abstract sense, not a network that has to do with labor issues, not a network that has to do with environmental issues, not a network that has to do with occupational safety issues. The only network that counts, the only fiduciary duties that count, the only fiduciary duties that we're going to look at are ones that pertain to the conduct at issue here. What is the conduct? Let's focus on what is the conduct at issue? In the tribes of complaining... I don't envy you having to defend the secretary's behavior, which was abominable. Actually, the Supreme Court was totally unperturbed by the secretary's conduct here. That's why I'm not on the Supreme Court. But in any event... In any event, the secretary's behavior, what is it exactly that the secretary did that is at issue before us? If you look at the very first paragraph of the tribes complaint, that identifies two things. One is approving the lease amendments, and the other is vacating the area director's royalty rate adjustment decision. So the disposition of Peabody's administrative appeal and the approval of the lease amendments. Let me read to you something from the Supreme Court's decision. It turns out, of course, it happens to be the dissent. But nevertheless, it's interesting. The dissent says, More importantly, the gravamen of the tribe's claim is not that it is entitled to the 20% rate adjustment under the lease, rather it is that the secretary's actions in deceiving the tribe about the status of Peabody's appeal skewed the subsequent bargaining process and the resulting royalty rate in Peabody's favor. On that issue, whether the secretary might have ultimately favored Peabody's appeal while perhaps the subject of relevant evidence is not this positive. The dissent sees the issue as a quite different kind of issue. The dissent sees the issue as the secretary skewing the negotiation, not picking a 12.5% or 20% royalty. How do you... Well, I think that's fully consistent with what I said. It's just, what is wrong? You asked what are the two decisions, and that's one explanation of what the tribe says is wrong with those decisions. But still, those are the decisions that are at issue here. You can characterize them as we have or characterize them as the tribe has, but still, it's those two decisions that are issued. They have to do with a disposition of an administrative appeal, and they have to do with an approval of a lease amendment. None of the aspects of the tribe's network have anything to do with those two issues. They have to do with other aspects of full leasing that might occur. They have to do with right-of-ways. They have to do with occupational safety. They have to do with labor safety. How about the Rehabilitation Act? The Rehabilitation Act, if you look at the first provision of the Rehabilitation Act, it is a list of monies, a program of improvements, that the Secretary of the Interior is instructed to undertake for the tribe's benefit. None of those things have anything to do with full leasing. The tribe has tried to piggyback the Rehab Act onto IMLA by saying that there is a leasing provision in the Rehab Act, but the leasing provision in the Rehab Act is no different than the IMLA leasing provision. That's what they're saying, isn't it? They're saying that basically the Rehabilitation Act does provide for additional aspects of the trust responsibility that the Secretary has. Yes, I agree with that first point. Those are no more in the Rehabilitation Act than they are in the IMLA. If you look at the Rehabilitation Act, it provides some of that. There are some fairness provisions in there that should be required by the Secretary. How can the Secretary approve a lease? Does he approve the lease subsequent to the negotiation? The lease amendments, yes. The lease amendments were approved. Yes. And he knew exactly what was going on with respect to the particular recommendations that were made by the area director. And he also knew that the Bureau of Land Management was going to receive an additional benefit from it because of the lower cost of the coal. I don't think that's in the record. No, that's not in the record, but it's part of it. One of the aspects of the BLM that came out. I don't think that's in the record. But I think the important thing is that there's nothing in the record to indicate that the Secretary was doing anything other than fairly disposing of the issue before him. He thought it was in the best interest. Fairly? Fairly disposing? That's the broad use of the term, fairly disposing. In his judgment, he thought it was better for him to negotiate in settlement rather than in the past year. And I think it's very important to note here that the tribe has never sought to set aside the lease amendments that they negotiated. They wanted to keep the lease amendments that they negotiated and get money damages from the government. If they really thought that the deal they got here, that the lease amendments were improper, they should have tried to set aside the lease amendments. So you're telling me you think the Secretary was actually acting in his belief in the best interest of the Navajo Nation when he undertook the actions he took? Fairly. The best interest of the Navajo Nation. I didn't say that, and that's not a statutory requirement. Really? Because I understand all of the statutes in this network to suggest that the government has the obligation to assist the Navajo Nation. No more so than under Inland. All of these statutes are in some general aspirational sense for the benefit of the tribe. None of them, at least as to the conduct at issue here, identifies a specific duty. Let's go back to my question. Was this to the benefit of the tribe, the Secretary's decision? There has been no proof one way or the other. Have there been? Keep in mind, it's not the subjective intent of the Secretary. It's whether objectively, what was the objective basis for the decision, and there's been no proof whatsoever. But only because the claims court rejected this case for lack of jurisdiction. No, no, no. This is a summary judgment in the court of federal counsel. If we were to assume the facts presented by the Navajo Nation, it seems to me that you may get a case of. We can't do that because it's gone to summary judgment. Each side has proffered its evidence. If there is a disputed material fact, which is what Justice Souter thought should happen, and he, of course, is in the dissent in the Minority Supreme Court. If there's a disputed material fact, that can go back to the CSE for a trial. Wait a minute. Basquiat's first opinion was not flattering about the Secretary, was it? No, that's true. That's true. I will admit that. In fact, it was a little less than flattering, was it? That's quite right. That's quite right. Those are now facts found in the summary judgment decision last year in May. Now, he didn't give relief. He said only because the law was against it, he thought. But, see, that's what Justice Souter was specifically addressing when he said that's not really what's at stake. That's not the essence of the tribe's claim. It would have to be this balancing that went on and skewing, and they would have to make out their disputed issues and back us to that. So what I'm saying is that Justice Souter was sort of taking it. Justice Souter, who dissented from the majority, would have attempted. Here's my point of confusion. If the Secretary's action was objectively fair or in the best interest of an Alamo nation, even just fair, then why would he reach the conclusion to hold back an opinion, to tell his assistant not to issue it, to tell them, to tell a nation that the opinion was not forthcoming, go back to the bargaining table? After, interestingly, getting together on multiple occasions with a lobbyist at the request of Peabody, one of the parties to the lease. It just seems awfully ex parte to me, and the Secretary was not ambiguous about his communications. To his benefit, he did not lie or misrepresent the events of those meetings, but he's meeting with one of the parties, ex parte, not telling the other one about it, and then making actions, and you're saying those are fair? That's fair? That was your word, fair, right? Well, I think that two things. One is we're talking solely about whether there's a breach. We've skipped over the issue of whether there's a duty. There can't be a breach without a duty. You can't answer the question of whether there's a breach until you've identified what the duty is. Well, that's a much better point for you. You shouldn't have started by defending the Secretary as being fair. Well, all I'm saying is that none of the – there are no duties to him. You're talking about his being fair presupposes he has a duty. Isn't that right? Well, I think that's right. The sense in which I was using the word fairness was in reference to any duties that might apply, that he could impose some duty, and I could answer the hypothetical about as to that duty, and that's why I was resisting Judge Moore's hypothetical asking, is this in the best interest of the Indian? Because there is no statutory or regulatory requirement to act in the best interest. You say there's no duty on the government to act in the best interest of the Navajo Nation. That is exactly what the Supreme Court held. That is expressly what the Supreme Court held in its decision. I don't think that. I think they looked at three statutes and said we don't find any duty in these three statutes. But the Navajo Nation has now come forth with 15 more at the invitation, apparently, of the Supreme Court because they remanded the whole thing. Well, with all due respect, I think that the important thing about the Supreme Court's decision is that, sure, it only addressed Imla, but Imla is the statute underneath which the Secretary was acting underneath here. If there is a network that the tribe has constructed here, it has a giant gaping hole over this that is governed by Imla. Wait a minute. Under Section 635 of the Rehabilitation Act, any lease by the Navajo tribe has to be ultimately approved by the Secretary of the Interior, correct? Well, that's presuming that Imla isn't an independent victim. Two things. First, that assumes that the Rehab Act there is doing something in addition to Imla. That may answer the judge's question. Isn't it correct that the Rehab Act addresses the question of leasing of lands and minerals by the Secretary and by the Interior? Yes, but there was nothing in the record until the Supreme Court's decision in this case to suggest that the Secretary's approval here or review occurred pursuant to the Rehab Act. And isn't it also true, counsel, that 635B and C explicitly exempt from liability the government, but 635A doesn't do so? Yes, that is true. But 635A cannot possibly be the basis for monetary liability because it is almost exactly the same language as Imla. You would be reading two essentially identical statutory provisions precisely the opposite. Never heard of it in the panels of law. Is that correct? Well, certainly the panels of statutory construction strongly disagree with that. But in addition, I think it's important that the Supreme Court did not just hold that there were no duties under Imla. In the rest of Imla, as I'm remembering it, it doesn't specifically exempt from liability other sections, right? And here we really do have two different situations. We've got one statute that lists several requirements and then lists other requirements saying the government should not be subject to liability. Well, it seems to me that a fair reading of all of those together would mean the first would subject the government to liability. Imla has no similar disclaimers exempting the government from liability in any of its sections. So it doesn't speak to that, which means it's a wide-open canvas. Well, a couple of things. One is liability, of course, doesn't necessarily bring to monetary liability. So there could be liability under the APA in the second siding. Actually, liability, you can talk about $1,000 somewhere, don't they, or something? 25 U.S.C. 177. Oh, OK. Sorry. I was getting my statutes mixed up. But in addition, I think that still you have the fundamental problem of the Supreme Court in its decision said approval isn't enough. There has to be something else, and there isn't. The other thing, though, I think that's extremely important for this court to consider is that the Supreme Court said that Imla is incompatible with Imla to have fiduciary duties because the tribe is in charge. This court, by using other statutes, SMAPA, FABRMA, occupational safety statutes, imposing duties on the secretaries at implementation of Imla would be directly contravening the withholding of that case. What about 638 in the Rehabilitation Act? Did the secretary keep the Navajo Nation informed? That provision has to do—it explicitly talks about the program of improvements. The improvements are listed in the first provision of the Rehab Act, and none of the improvements involve approving leases. They have to do with the secretary's various—there's things like studies, there are hospitals, things like that. They don't involve the actions that were taken in this case. Thank you, Mr. O'Donnell. Thank you. Do you think you have another question? I hope you were just getting warmed up. Counsel, I have two quick questions for you before you delve into whatever it is you're doing. One of them is it seems to me the government makes a very telling point when the government says despite the lobbying and the ex-party activities of the secretary, the Navajo Nation has never objected to the ultimate result of the negotiation, and it sounds like what you want to do is keep the benefits of the deal you made and get a little extra money on the side. Two responses.  Two responses. We have sued Peabody, Senator California Edison, and the Salt River Project here in the District of Columbia District Court to reform the lease. The second is— What was the result of that? It's state pending negotiations that are ongoing. That's in the D.C. Circuit. D.C. District. D.C. District. And the second point is there are some benefits to this lease, and we have, I think, due to the fact that we're throwing out the baby with the bathwater, but on balance, the notion that there's no proof in the record of damages is absolutely absurd. Page 736— Excuse me. Is that action for reformation of the lease? Yes, it is. Entirely, or just to the issue of royalties? I'm not lead counselor, Your Honor. I believe— If you don't know, you can just say, I know, I know. That's the best answer. I have a quick question for you before you wander off into damages, and that is, would you, for the record, tell me what you think the central gravamen of your complaint is? Is it the 12.5 to 20 percent rate difference, or is it the idea that Justice Souter suggested, which is that it tainted the whole negotiation, the interference of the Secretary? It's more on the lines of what Justice Souter said. In fact, he asked me, is this the gravamen of your complaint? And I said, yes, in oral argument. So there was a deliberate skewing of negotiation. The Secretary ordered his subordinates to lie to us. They did lie to us in the person of Tim Volman, who named his son, Peterson Zahl Volman, after the Navajo Nation chairman, the last person we would suspect of this kind of activity. And as Judge Basquiat very eloquently said in his first opinion, a negotiator's weapon is knowledge, and we were deprived of the same kind of knowledge that our trustee was feeding to Peabody, Edison, and the others. By the way, the Rehabilitation Act doesn't just talk about programs and money. Section 631 talks about a program of basic improvements for the conservation and development of the resources of the Navajo and Hopi Indians. By the way, the damages are shown sort of boldly. Pages 736 and 787 of the appendix. $347 million for one of the power plants, the one that BOR, the Bureau of Reclamation, owns a quarter interest in, and $89 million worth of backed taxes and backed royalties that we waived to get the sub-12.5% deal. The federal government, on the other hand, routinely was getting more than 12.5% for its leases and was requiring a substantial bonus to boot. By the way... Is that in the record? Oh, it is indeed. I believe it's page 4224. It's in volume 4, and it's actually a memo by a fellow named Stucky for Peabody saying here are all the federal leases, over 12.5% for surface leases and over 8% for underground leases. Is the ownership of the particular ownership of the power plant also in the record? It is, Your Honor, and that's... Is that the allowance ownership? It's Bureau of Reclamation, not BOR. And that is in the record. It's in answer to the interrogatory number 13, I believe, page 1860 of the appendix. There are, I guess, not a whole lot more points I can make right now. The notion that self-determination is a defense, I think, is wrong. The Indian Tucker Act explicitly provided that the United States would have the same defenses in law and equity as it has in other Tucker Act cases. Self-determination isn't a defense. It might be useful to determine whether a statute provides simply a bear trust or something more, but the defense is a consent defense. That's what respect for tribal decision-making really invokes. And the government can't succeed in a consent defense because the Navajo Nation was not given all of the facts of the case. It was actively concealed from the Navajo Nation. Page 771 of the appendix, the rights that the Navajo Nation had. And it was feeding all of this information to our adversaries. So the consent defense just doesn't hold water. And I don't think that... We certainly would urge that the court reject the notion that a respect for tribal self-determination that was basically kicked around like an old football, in this case, has any bearing on the liabilities of the United States. Thank you.